IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CHRISTOPHER PYLES,                       )
                                         )
                    Plaintiff,           )
                                         )
vs.                                      )     Case No. 13−cv−0299−SCW
                                         )
WILLIAM SPILLER et al.,                  )
                                         )
                    Defendants.          )

## ORDER

WILLIAMS, Magistrate Judge:

### Procedural History

Plaintiff originally filed this suit on March 21, 2013, bringing claims of unconstitutional conduct pursuant to § 1983 at Menard Correctional Center.  (Doc. 1).  The Court then screened the case pursuant to § 1915A on April 12, 2013.  (Doc. 9).  Ultimately that order divided the case into two surviving counts: 1) against Gaetz Rednour, Spiller, Atchison, Harrington, Butler, Taylor, Randle, Godinez, Bates, Thomas and unidentified lockdown coordinators and staff for acting with deliberate indifference to Plaintiff's health and safety by instituting unjustified, prolonged lockdowns that amounted to cruel and unusual punishment in violation of Plaintiff's Eighth Amendment rights and 2) against Sauerwein, Creason, and unidentified others for deliberate indifference to serious risks to Plaintiff's mental and physical health due to the lockdown conditions in violation of the Eighth Amendment, and intentional infliction of emotional distress in violation of state law.  (Doc. 9).  Sauerwein filed a suggestion of death and was dismissed with prejudice on December 23, 2013.  (Doc. 61).

Not content with the dismissal of his other claims, Plaintiff moved for leave to amend on May 6, 2013.  (Doc. 29).  He filed a second motion seeking leave to amend the complaint on

1

September 30, 2013.  (Doc. 59).  On January 23, 2014, the Court permitted the amended Complaint, but dismissed Plaintiff's first count of that Complaint on threshold review.  (Doc. 68).  The Amended Complaint named Brown, Cowan, Hasemeyer, Lashbrook, Lyerla, Moore, Olson, and Thomas in place of the unknown defendants in Count 3; and Baig, Greathouse, Whiteside, Hillerman, Delong and Kowalkowski in place of the unknown defendants in Count 4.  (Doc. 68).

Plaintiff voluntarily dismissed Hillerman on June 26, 2014.  (Doc. 125).  The Court also granted Creason's motion to dismiss the state law claims against her.  (Doc. 156).  Defendants Greathouse, Whiteside, Delong, and Baig were dismissed for failure to exhaust administrative remedies on December 12, 2014.  (Doc. 157).

On August 8, 2014, the Court appointed attorney Laura Robb to represent Plaintiff.  (Doc. 136).  She was replaced by Sarah Mangelsdorf on September 30, 2015, and Plaintiff has proceeded with counsel since that time.  (Doc. 180).  Plaintiff voluntarily dismissed Defendants Gaetz, Rednour, and Randle on August 10, 2015.  (Doc. 174).  Plaintiff then filed a Second Amended Complaint bring one claim for cruel and unusual punishment against Defendants Atchison, Harrington, Spiller, Butler, Godinez, Taylor, Bates, Brad Thomas, James Brown, Joseph Cowan, Chad Hasemeyer, Jacqueline A. Lashbrook, Doug Lyerla, Richard Moore, Paul Olson, William Rees, and Brian Thomas based on 1) excessive lockdowns; 2) severe overcrowding; and 3) the double-celling of Plaintiff.  (Doc. 175).

On October 9, 2015, Defendants Atchison, Bates, Brown, Butler, Cowan, Godinez, Harrington, Hasemeyer, Lashbrook, Lyerla, Moore, Olson, Rees, Spiller, Taylor, Brad Thomas, and Brian Thomas filed a Motion for Summary Judgment.  (Doc. 184).  After granting Plaintiff an extension, Plaintiff filed his response on December 10, 2015.  (Doc. 189).  The Court held hearing on this matter on March 1, 2016.  (Doc. 209).  For the following reasons, the Court **GRANTS** the Motion for Summary Judgment.  (Doc. 184).

**Factual Background**

Defendants submitted an affidavit from Kim Butler, the current warden of Menard, who has 23 years' experience as an IDOC employee. (Doc. 185-1). She testified that lockdowns may be instituted for multiple reasons related to the safety and security of Menard, including but not limited to: assaults on staff, gang-related activity, hidden weapons, and staff shortages. (Doc. 185-1, p. 1). The staff may also conclude that a security threat exists, which may require investigations and/or shakedowns. (Doc. 185-1, p. 1). Investigations and shakedowns themselves require controlled environments, and the shifting of resources, including personnel. (Doc. 185-1, p. 1). Inclement weather, like a severe snowfall, may also cause a staff shortage, which would also require a lockdown to maintain a safe and secure environment. (Doc. 185-1, p. 2). Lockdowns may affect the entire facility or be targeted to specific areas, including cell houses or cell house units. (Doc. 185-1, p. 2). The length of any given lockdown is determined on a case-by-case basis and is determined day-to-day. (Doc. 185-1, p. 2). Even if an incident appears isolated, the investigation into the incident may require a broader lockdown in order to fully investigate the incident. (Doc. 185-1, p. 2).

Lockdowns may be instituted either as Level 1 or Level 4. (Doc. 185-1, p. 2). During a Level 1 lockdown, inmates are almost completely restricted from leaving their cells. (Doc. 185-1, p. 2). Showers are restricted for the first 7 days of the lockdown. (Doc. 191-1, p. 2). There is no commissary or yard time, inmate workers do not report to their assignments, and meals are served directly at the inmates' cells. (Doc. 185-1, p. 2). All visits to the health care unit, except emergencies, are cancelled, although the health care unit staff will make rounds and inmates continue to get their medication. (Doc. 185-1, p. 2). Mental health care staff may also make rounds. (Doc. 185-3, p. 2). Dr. Baig, in particular, tries to make his rounds on lockdown by visiting cell fronts. (Doc. 185-4, p. 6). Inmates are also prohibited from visiting the law library, although the law library staff will also make rounds to assist inmates with a looming deadline. (Doc. 185-1, p. 2).

Showers are provided once a week.  (Doc. 185-1, p. 2).  Visits, including legal visits are restricted, although exceptions may be made.  (Doc. 185-1, p. 2).

A Level 4 lockdown differs from a Level 1 lockdown in that most inmate workers are able to leave their cells to perform their jobs.  (Doc. 185-1, p. 2) (Doc. 185-2, p. 7-9).  The determination of which workers will get to leave is determined on a case-by-case basis.  (Doc. 185-1, p. 2).   In Plaintiff's experience, when the facility is on a Level 4 lockdown, half of the inmates assigned to a job may be let out one day, with the other half being let out the next.  (Doc. 185-2, p. 9). Plaintiff also testified that the health care unit may run health care passes on Level 4, but not always.  (Doc. 185-2, p. 3).  Group therapy sessions are frequently cancelled on Level 4 lockdowns.  (Doc. 190-6, p. 44).  Level 4 lockdowns are inconsistent.  (Doc. 185-2, p. 21).  Many individual privileges can be granted or restricted during a lockdown at the discretion of the prison management.  (Doc. 185-6 through Doc. 185-17).   Medical records submitted by Plaintiff show that he missed approximately four mental health appointments in 2011 and 2012.  (Doc. 190-10) (Doc. 190-11) (Doc. 190-12, p. 12).

From Plaintiff's perspective, lockdowns are excessive when they happen for isolated incidents like a fight, a staff assault, or contraband.  (Doc. 185-2, p. 4).  Plaintiff also characterizes events such as isolated fights between two inmates from other cell houses, staff assaults, rumors of potential fights as "non-penologically-related purposes."  (Doc. 191-1, p. 1).  He feels that the lockdowns seem geared towards punishing the prison population as a whole, as opposed to punishing the individuals who committed the infractions.  (Doc. 185-2, p. 4).  Plaintiff believes that lockdowns are also used to avoid paying overtime to employees and to give staff vacation time.  (Doc. 191-1, p. 1).  When the lockdown is the result of an investigation, it sometimes continues for weeks or even months.  (Doc. 185-2, p. 4).  Plaintiff's assessment of the reasonableness of the lockdown is based on his experience as a prisoner.

Plaintiff's cell is typically too small to perform an activity like running in place. (Doc. 185-2, p. 11). During the time that Plaintiff was double celled, his cell typically had only 12 square feet of unencumbered floor space, which typically measured 7 feet, 8 inches by 19 inches. (Doc. 191-1, p. 2). The cells in 1 and 3 gallery used to be single cells and were converted to double cells. (Doc. 185-2, p. 11). Plaintiff's ability to exercise in his cell is inhibited by the small cell size. (Doc. 191-1, p. 2). If an inmate wanted to do push-ups or sit-ups, he could try doing those in his own bunk. (Doc. 185-2, p. 11). If your cellie has the bottom bunk, you may have to clear floor activity with him out of respect. (Doc. 185-2, p. 11). Two people cannot use the cell floor at the same time, and occupying the cell floor will cut your cellmate off from the rest of the cell. (Doc. 185-2, p. 12). Plaintiff has experienced muscle cramping, worsening back and joint pain, atrophied muscles, and vertigo as a result of the lack of exercise. (Doc. 190-1, p. 3). Inmates are permitted to keep a correspondence box and a property box in their cell. (Doc. 185-2, p. 13). The property boxes can be stored under the bunks, but the correspondence boxes are kept on the floor. (Doc. 185-2, p. 13). Inmates are permitted to have certain items of clothing on the floor. (Doc. 185-2, p. 13). Plaintiff also typically keeps his TV and his fan on his bunk. (Doc. 185-2, p. 13).

Plaintiff alleges that he has experienced stress, anxiety, headaches, sleeping problems, including night terrors and insomnia, disassociation, panic attacks, worsening depression, manic episodes, increase paranoia, lack of concentration and focus, and fear as a result of the small cell size. (Doc. 190-1, p. 3). Creason has observed Plaintiff with symptoms of anxiety and stress that are atypical for bipolar disorder. (Doc. 190-3, p. 14). However, she cannot say that prison has made Plaintiff's mental health condition worse. (Doc. 190-3, p. 73).

Plaintiff suffers from bi-polar disorder. (Doc. 185-2, p. 14) (Doc. 190-3, p. 12). Creason testified that when she first began treating Plaintiff he was "a poster child for bipolar disorder." (Doc. 185-3, p. 3). However, once they figured out his medication, Plaintiff's moods leveled out.

(Doc. 185-3, p. 3).  When he takes his medication, he is very high functioning.  (Doc. 185-3, p. 3). Creason attributes changes in his condition to medication concerns, not cell conditions.  (Doc. 185-3, p. 4).

Between October 2011 and June 2013, Plaintiff was single-celled due to his medical condition.  (Doc. 185-18) (Doc. 190-1, p. 2) (Doc. 190-8).  However, the Court notes that the single-cell order was signed by Melissa Sauerwein, who is deceased, and Creason did not know her reasoning for recommending Plaintiff be singled-celled.  (Doc. 190-3, p. 64).  Creason also noted that Plaintiff was single-celled on 1 and 3 gallery, which was turned into a mental health wing so that prisoners could more easily attend group therapy sessions.  (Doc. 190-3, p. 68-69).  Those galleries were eventually converted into double-cells by adding a bed so that more inmates could be housed in the mental health area.  (Doc. 190-3, p. 69).  Plaintiff claims that when he was first double-celled in June 2013, he was told that it would be temporary.  (Doc. 190-1, p. 2).  Baig recalls Plaintiff making complaints about the double celling.  (Doc. 190-9, p. 11).

Plaintiff also claims that the conditions at Menard have caused him to suffer anxiety and insomnia.  (Doc. 185-2, p. 14).  He feels "like a caged animal."  (Doc. 185-2, p. 15).  Plaintiff's periods of depression and mania are more intense during a lockdown.  (Doc. 185-2, p. 15).  These fluctuations are related to stress.  (Doc. 185-2, p. 15).  The stress also lengthens Plaintiff's mania and depressive periods.  (Doc. 185-2, p. 16).  The negative effects that Plaintiff suffers due to the small cell size are also exacerbated by the lack of adequate out of cell time for reasonable movement and exercise.  (Doc. 190-1, p. 3).  Plaintiff also claims that he now suffers from anxiety and insomnia since coming to prison.  (Doc. 190-6, p. 31).  When a lockdown permits Plaintiff to work, it helps his mental condition.  (Doc. 185-2, p. 16).

Baig does not recall Plaintiff ever having complained to him that the lockdowns were exacerbating his symptoms.  (Doc. 185-4, p. 7).   Plaintiff did tell Baig that he was frustrated on June 9, 2012 because they were on lockdown and he did not know why.  (Doc. 190-0, p. 59).  Baig was not able to tell Plaintiff why the prison was on lockdown.  (Doc. 190-9, p. 60).  Baig believes that security concerns justify lockdowns.  (Doc. 190-9, p. 60).  He also believes that many facets of prison life may serve to increase a prisoner's anxiety.  (Doc. 190-9, p. 74).

Plaintiff believes there was an informal policy in 2011 to place the facility on a Level 1 lockdown for one month and a Level 4 lockdown for 1 month after any staff assaults.  (Doc. 185-2, p. 17).   In his opinion, consecutive one month lockdowns served no other purpose than punishment.  (Doc. 185-2, p. 17).

Defendants did not dispute that Plaintiff exhausted his administrative remedies in this case, and Plaintiff submitted copies of his grievances from the relevant time period.  (Doc. 190-2).

The West cell house at Menard went on Level 1 lockdown from January 10, 2011 until January 26, 2011.  (Doc. 185-5, p. 1).  Initially, the West cell house was put on lockdown due to a threat on an inmate's life provided by a confidential informant.  (Doc. 185-9, p. 67).  The general division went on Level 1 lockdown from January 14, 2011 until January 15, and then remained on Level 4 until January 16, 2011 due to a shakedown by the State-wide tactical team of the West cell house, which recovered homemade weapons and other contraband.  (Doc. 185-5, p. 1) (Doc. 185-9, p. 41).

The facility was on Level 4 lockdown from February 1, 2011 until February 5, 2011 due to inclement weather that struck the state on February 2, 2011. (Doc. 185-9, p. 37) (Doc. 185-5, p. 1).  Another Level 1 lockdown was initiated on February 18, 2011 due to a confidential informant's report of a planned "hit"; the lockdown was reduced to Level 4 on February 21, 2011 and normal operations resumed on February 23, 2011.  (Doc. 185-5, p. 1).

The West cell house went on Level 1 lockdown on March 17, 2011 due to a fight in the West dining room.  (Doc. 185-9, p. 24).  It went on Level 4 lockdown on March 18, 2011 and resumed normal operations on March 19, 2011.  (Doc. 185-5, p. 1).

The East cell house went on Level 1 lockdown on April 11, 2011.  (Doc. 185-5, p. 1).  The rest of the prison went on a Level 1 lockdown the next day on April 12, 2011 due to a staff assault.  (Doc. 185-5, p. 1) (Doc. 185-8, p 5).  The South cell house and North 1 and North 2 cell house went to Level 4 on April 14, 2011 and resumed normal operations on May 9, 2011.  (Doc. 185-5, p. 1).  The East and West cell houses went to Level 4 on April 20, 2011.  (Doc. 185-5, p. 1).  The East cell house resumed normal operations on May 17, 2011 and the West cell house resumed operations on May 26, 2011. (Doc. 185-1, p. 1).

There was a one-day Level 4 lockdown on May 24, 2011 due to a shakedown of the West cell house. (Doc. 185-8, p. 9). All units returned to normal operations that same day, except for the West cell house.  (Doc. 185-1, p. 1).

The prison went on Level 1 lockdown on June 8, 2011 due to a fight involving five offenders from North 1 cell house, (Doc. 185-7, p. 38), which was downgraded to a Level 4 lockdown on Gaetz's authority on June 9, 2011.  (Doc. 185-1, p. 1) (Doc. 185-7, p. 42).  Normal operations resumed June 13, 2011.  (Doc. 185-1, p. 1).  The prison went back on Level 1 lockdown on June 18, 2011, but all units except the East cell house resumed normal operations the same day.  (Doc. 185-1, p. 1).  Two inmates from East cell house began fighting and then turned their aggression on responding staff.  (Doc. 185-7, p. 33).  The decision to place the facility on lock down was made due to the location of the incident, the fact that it was possibly staged, security threat group concerns, and the fact of a staff assault.  (Doc. 185-7, p. 36).  The East cell house went on Level 4 lockdown on June 20, 2011, and resumed normal operations on June 21, 2011.  (Doc. 185-1, p. 1).  Another Level 1 lockdown occurred on June 23, 2011 due to a fight involving six inmates,

(Doc. 186-7, p. 21) and was downgraded to a Level 4 on June 27, 2011.  (Doc. 185-1, p. 1).  All units resumed normal operations on June 28, 2011.  (Doc. 185-1, p. 1).

But the prison immediately went back on Level 1 lockdown the next day on June 29, 2011 due to a staff assault that occurred in the law library.  (Doc. 185-1, p. 1) (Doc. 185-6, p. 97-98).  The inmate involved was immediately transported to Tamms.  (Doc. 185-6, p. 97).  All cell houses, with the exception of the East cell house went to Level 4 lockdown on July 6, 2011.  (Doc. 185-1, p. 1).  Gaetz sent an email to Godinez on July 20th assessing the mood of staff and offenders.  (Doc. 185-6, p. 113).  Staff was described as "emotional," while the inmates were "quiet and pleasant."  (Doc. 185-6, p. 113).  Gaetz discussed the summer heart and described efforts to address it on the wards.  (Doc. 185-6, p. 113).  Gaetz also reported that intelligence staff believed that it "had a handle" on recent gang activity.  (Doc. 185-6, p. 113). Gaetz recommended that North 1 move to normal operations on July 21.  (Doc. 185-6, p. 113).  North 1 resumed normal operations on July 21, 2011.  (Doc. 185-1, p. 1).

The prison briefly went on Level 1 lockdown again on July 22, 2011, but all units with the exception of North 2 immediately went to Level 4.  (Doc. 185-5, p. 2).  North 2, went to Level 4 on July 26, 2011.  (Doc. 185-5, p. 2).  The other units were all back to normal operation by July 28, 2011, although they rolled back to normal operations.  (Doc. 185-5, p. 2).  There was another Level 1 lockdown on July 28, 2011 due to a staff assault.  (Doc. 185-5, p. 2) (Doc. 185-6, p. 58).  That inmate reported that he was angry because staff refused to allow him to go to chow; he was immediately transferred to Tamms Correctional Center.  (Doc 185-6, p. 79).  South Uppers and Lowers, R&C, and North 1 went to Level 4 on August 8, 2011.  (Doc. 185-5, p. 2).  East cell house, West cell house, and North 2 went to Level 4 on August 10, 2011.  (Doc. 185-5, p. 2).  Rednour sent a memorandum to Gaetz indicating that the internal affairs/intelligence unit would monitor phone calls and mail.  (Doc. 185-6, p. 65).  Rednour also indicated that the staff would analyze the

intelligence gathered from telephone calls, mail, and confidential informants to evaluate lockdown status for Monday, August 15, 2011.  (Doc. 185-6, p. 65).  The cell houses began returning to normal operations on August 24, 2011 and all cell houses were in normal operations by August 26, 2011.  (Doc. 185-5, p. 2).  The cell houses spent between 23 and 31 days on lockdown in July 2011.  (Doc. 185-11, p. 90).  They spent between 22 and 25 days on lockdown in August 2011.  (Doc. 185-11, p. 90).

On September 1, 2011, the facility went back on Level 1 lockdown because a staff assault occurred in the East dining room.  (Doc. 185-5, p. 2) (Doc. 185-6, p. 22).  All cell houses, with the exceptions of the East and West cell houses went to Level 4 on September 15, 2011 and resumed normal operations on September 23, 2011; those cell houses went to Level 4 on September 22, 2011.  (Doc. 185-5, p. 2).   East cell house resumed normal operations on September 26, 2011 and West cell house resumed normal operations on September 28, 2011.  (Doc. 185-5, p. 2) (Doc. 185-6, p. 22).  The cell houses spent between 22 and 27 days on lockdown in September 2011.  (Doc. 185-11, p. 90).

East cell house went on Level 1 on October 13, 2011 because four inmates were fighting in the East dining room. (Doc. 185-5, p. 2) (Doc. 185-6, p. 16).  That cell house went to Level 4 on October 14, 2011.  (Doc. 185-5, p. 2).  It resumed normal operations on October 18, 2011.  (Doc. 185-5, p. 2).  The West cell house went on Level 1 lockdown on October 23, 2011 and resumed normal operations on October 24, 2011.  (Doc. 185-5, p. 2).  All units went on Level 1 lockdown on October 25, 2011 due to inmate assaults in the East yard.  (Doc. 185-5, p. 2) (Doc. 185-6, p. 8).  East cell house, West cell house, and portions of North 2 went on Level 4 on October 27, 2011; all other units went back to normal operations.  (Doc. 185-5, p. 2).  The affected units went off Level 4 on November 1, 2011.  (Doc. 185-5, p. 2).  The cell houses spent between 2 and 12 days on lockdown in October 2011; no lockdowns were reported in November 2011.  (Doc. 185-11, p. 90).

South Uppers and Lowers went on a Level 1 lockdown on December 7, 2011, which was downgraded to a Level 4 the next morning and terminated in the afternoon. (Doc. 185-5, p. 2). A piece of cyclone fencing was missing from the inmate commissary and a search of South Uppers and Lowers was conducted. (Doc. 185-6, p 1). On December 31, 2011, the prison went on Level 1 lockdown; the lockdown ended the next day. (Doc. 185-5 p. 2). South Uppers spent 2 days on lockdown in December 2011 while South Lowers spent 3. (Doc. 185-11, p. 90).

The prison went on Level 1 lockdown on January 6, 2012 after an inmate altercation in the West dining room with shots fired. (Doc. 185-5, p. 3) (Doc. 185-12, p. 69). The West even cells were searched on January 7 and 8. (Doc. 185-12, p. 69). All cell houses except the West cell house went on Level 4 on January 9, 2012, although East cell house joined the West on Level 1 lockdown that afternoon because a homemade weapon was found. (Doc. 185-12, p. 69). East cell house was then subject to cell searches on January 12 and January 13, during which three weapons were found. (Doc. 185-12, p. 69). West cell house went on Level 4 on January 18, 2012. (Doc. 185-5, p. 3). Normal operations resumed for most cell houses on January 17, 2012. (Doc. 185-5, p. 3). However East cell house went on Level 1 on January 10, 2012 and West cell house went back on Level 1 on January 19, 2012. East cell house did not resume normal operations until January 20, 2012. (Doc. 185-5, p. 3). West cell house went on Level 1 lockdown on January 26, 2012 because 4 to 5 inmates were observed fighting on the East yard. (Doc. 185-12, p. 68). Those inmates were placed on investigative status in segregation. (Doc. 185-12, p. 68). West cell house went to Level 4 on January 30, 2012 and resumed normal operations on January 31, 2012. (Doc. 185-5, p. 3). Total days on lockdown in January 2012 varied from 11 to 19. (Doc. 185-11, p. 90).

On February 7, 2012, the institution went on Level 1 lockdown after a staff assault on the West cell house door. (Doc. 185-12, p. 47). Intel began interviewing inmates from West cell house on February 8. (Doc. 185-12, p. 47). Shakedowns took place between February 9 and February 13.

(Doc. 185-12, p. 47).  Mental health services were provided on February 9, 10, 11, and 15.  (Doc. 185-12, p. 47).  All units except West cell house went on Level 4 lockdown on February 14, 2012; West cell house went on Level 4 lockdown on February 16, 2012.  (Doc. 185-5, p. 3).  Most units returned to normal operations on February 16, 2012; West cell house returned to normal operations on February 17, 2012.  (Doc. 185-5, p. 3).  On February 24, 2012, the institution went back on Level 1 lockdown due to multiple inmates fighting on the West yard.  (Doc. 185-5, p. 3) (Doc. 185-12, p. 13).  East cell house was shaken down with no contraband recovered on February 25, 2012, but two weapons were recovered from the West cell house.  (Doc. 185-12, p. 13).  Intel also interviewed inmates.  (Doc. 185-12, p. 13).  Shakedowns continued in the South lower, South upper, North 1, North 2, and common areas between February 27th ad March 2, 2013.  (Doc. 185-12, p. 13).  All cell houses except East and West cell house went on Level 4 lockdown on March 5, 2012.  (Doc. 185-5, p 3).  They then returned to normal schedule on March 7, 2012.  (Doc. 185-5, p. 3).  East and West cell houses went on Level 4 lockdown on March 8, 2012 and returned to normal schedule on March 13, 2012.  (Doc. 185-5, p. 3).  The cell houses spent between 13 and 14 days on lockdown in February 2012.  (Doc. 185-11, p. 90).

On March 19, 2012, all housing units went on Level 1 lockdown because of an inmate-on-inmate assault in the West dining room.  (Doc. 185-12, p. 11).  West cell house was searched on March 20 and 21.  (Doc. 185012, p. 11).  The lockdown was downgraded to Level 4 on March 21, 2012.  (Doc. 185-5, p. 3).  The facility resumed normal operations on March 22, 2012.  (Doc. 185-5, p. 3).  West cell house went back on lockdown Level 4 on March 26, 2012 until March 28, 2012 due to an inmate-on-inmate assault which resulted in an inmate being sent to an outside hospital to receive sutures.  (Doc. 185-5, p. 3) (Doc. 185-12, p. 9).  Intel conducted interviews in the West cell house on March 27, 2012.  (Doc. 185-12, p. 9).  The cell houses spent between 8 and 15 days on lockdown in March 2012.  (Doc. 185-11, p. 90).

North cell house went on Level 1 lockdown from April 6, 2012 until April 8, 2012 due to a staff assault.  (Doc. 185-5, p. 3) (Doc. 185-12, p. 7).  The facility as a whole then went on Level 4 lockdown from April 8, 2012 until April 10, 2012; intel conducted facility-wide interviews and the odd galleries in the East cell house were searched.  (Doc. 185-12, p. 5).  The facility was locked down again from April 23, 2012 until April 24, 2012 due to an incident that occurred at the Stateville Correctional Center, as a precautionary measure.  (Doc. 185-5, p. 3) (Doc. 185-12, p. 4).  West cell house was on a Level 4 lockdown from April 26, 2012 until April 30, 2012 due to a one-on-one cell fight in which a significant injury occurred.  (Doc. 185-5, p. 3).  In April 2012, all cell houses spent 3 days on lockdown, with the exception of West cell house, which spent 6.  (Doc. 185-11, p. 90).

On May 3, 2012, West cell house went on a Level 4 lockdown until May 5, 2012 due to two inmates fighting on the East yard.  (Doc. 185-5, p. 3) (Doc. 185-11, p. 143).  South Lowers went on a Level 1 lockdown from May 16, 2012, due to inmate fights throughout the day on May 16.  (Doc. 185-11, p. 125).  Intel conducted searches of random cells in the South cell houses with no major contraband found.  (Doc. 185-11, p. 125).  Intel conducted interviews from May 17 until May 19. (Doc. 185-11, p. 125).   On May 21, 2012, they went to a Level 4 lockdown before returning to normal operations on May 23, 2012.  (Doc. 185-5, p. 3).  West cell house went on a Level 1 lockdown on May 24, 2012, but returned to normal operations the next day.  (Doc. 185-5, p. 3). East cell house went on Level 1 lockdown on May 25, 2012 due to a fight between two inmates from the East cell house in the West yard, where a homemade weapon was discovered.  (Doc. 185-11, p. 130).  Intel interviewed inmates from East cell house on May 26, 2012.  (Doc. 185-11, p. 130). East cell house went to a Level 4 lockdown on May 28, 2012 before resuming normal operations on May 29, 2012.  (Doc. 185-5, p. 3).   In total, the cell houses spent between 6 and 10 days on lockdown in May 2012.  (Doc. 185-11, p. 90).

On June 3, 2012, the institution went on Level 1 lockdown because two inmates from 8 gallery in the West cell house assaulted Officer Ty Malley; a homemade weapon was also found following the incident. (Doc. 185-5, p. 3) (Doc. 185-11, p. 95). On June 4, 2012, the statewide tactical unit came in and shook down the West cell house, finding a total of 13 homemade weapons. (Doc. 185-11, p. 95). They shook down the East cell house on June 5, 2012 and found a total of 3 homemade weapons. (Doc. 185-11, p. 95). Intel also conducted interviews on those dates and transferred 19 inmates to other institutions. (Doc. 185-11, p. 95). Intel continued to interview inmates through June 7. (Doc. 185-11, p. 95). They found two 16 inch paper rods inside two confiscated typewriters, and collected all the inmates' extra fans. (Doc 185-11, p. 95). Most cell houses went to Level 4 lockdown on a rolling basis between June 19, 2012 and June 21, 201. (Doc. 185-5, p. 3). East and West cell house did not go to Level 4 until June 26, 2012. (Doc. 185-5, p. 4). All houses except East and West returned to normal operations on June 25, 2012. (Doc. 185-5, p. 3). East and West cell house returned to normal operations on June 28, 2012. (Doc. 185-5, p. 3). In June, the cell houses spent between 21 and 24 days on lockdown. (Doc. 185-11, p. 90).

West cell house went on a Level 1 lockdown on July 19, 2012 due to inmates refusing to come off the West yard. (Doc. 185-11, p. 5). On July 20th and 21st, intel conducted interviews. (Doc. 185-11, p. 5). The West cell house went to Level 4 lockdown on July 24, 2012. (Doc. 185-5, p. 4). East cell house went on Level 1 lockdown on July 20, 2012 based on information discovered in the intel interviews. (Doc. 185-11, p. 5). East cell house went to Level 4 on July 24, 2012. (Doc. 185-5, p. 4). All cell houses went on Level 1 lockdown on July 27, 2012 due to a tactical operation, (Doc. 185-11, p. 5). The North and South cell houses were taken to Level 4 the same day. (Doc. 185-5, p. 4). Menard intel conducted further inmate interviews with inmates from the West cell house on July 30, 2012. (Doc. 185-11, p. 5). East and West cell house did not go to Level 4 until August 10, 2012. (Doc. 185-5, p. 4). The North and South cell house resumed normal operations

on August 6, 2012.  (Doc. 185-5, p. 4).  On August 11, 2012, intel conducted further interviews with inmates from North 1 cell house.  (Doc. 185-11, p. 6).

North 1 then went on a Level 4 on August 10, 2012 and resumed normal operations on August 15, 2012.  (Doc. 185-5, p. 4).  The rest of the prison went on Level 4 lockdown on August 12, 2012.  (Doc. 185-5, p. 4).  The guards searched the odd galleries of the East cell as well as various cells in the North one cell house on August 14, 2012; 3 homemade weapons, 3 blanks, and other contraband were discovered.  (Doc. 185-11, p. 6).   All units except the East and West cell houses returned to normal operations on August 15, 2012.  (Doc. 185-5, p. 4).  On August 20, 2012, the prison went back on Level 1 lockdown in order to conduct a statewide tactical unit shake down of the West cell house and East odd galleries.  (Doc. 185-5, p. 4) (Doc. 185-11, p. 6).  As a result of this search, 10 homemade weapons were found.  (Doc. 185-11, p. 6).   East and West cell houses went to Level 4 lockdown on August 22 and August 23, respectively.  (Doc. 185-5, p. 4).  The North and South cell houses returned to normal operations on August 21, 2012.  (Doc. 185-5, p. 4).  East cell house returned to normal operations on August 23, 2012, and West cell house returned to normal operations on August 27, 2012.  (Doc. 185-5, p. 4).

Another Level 1 lockdown was instituted on August 27, 2012 due to a staff assault on the East yard gate.  (Doc. 185-5, p. 4) (Doc. 185-10, p. 120).  On August 28, 2012, intel conducted interviews of West cell house inmates, and searched 76 cells, along with the East yard, West yard and multi-purpose building, but found no major contraband.  (Doc. 185-10, p. 120).  The following day, intel interviewed 75 inmates from West cell house, and moved inmates in protective custody from the East cell house to the North 1 cell house.   (Doc. 185-10, p. 120).  Intel conducted another call out on August 30, 2012.  (Doc. 185-10, p. 120). Seventy-eight inmates were interviewed from West cell house on August 31, 2012.  (Doc. 185-10, p. 120).   The North cell house went to Level 4 on September 6, 2012 and normal operations on September 11, 2012.  (Doc. 185-5, p. 4).  The South

cell house went to Level 4 on September 11, 2012 and normal operations on September 13, 2102. (Doc. 185-5, p. 4).  East cell house was taken to Level 4 on September 18, 2012 and returned to normal operations one week later.  (Doc. 185-5, p. 4). Between September 17, 2012 and September 20, 2012, the library was shaken down and 20 pieces of metal were found hidden there.  (Doc. 185-10, p. 121).  West cell house did not go to Level 4 until September 25, 2012 and returned to normal operations only on October 2, 2012.  (Doc. 185-5, p. 4).

On October 5, 2012, the East cell house went on Level 1 lockdown after an inmate altercation on the East yard; the rest of the prison joined them the next day after a staff assault in the South dining room.  (Doc. 185-5, p. 4) (Doc. 185-10, p. 101).  Inmates were interviewed in connection with the yard altercation on October 6, 2012.  (Doc. 185-10, p. 101).  On October 9, 2012, the North 1 5 & 7 galleries were shook down; no contraband was found.  (Doc. 185-10, p. 101).  The South and West cell houses went to Level 4 on October 10, 2012 and general operations on October 11, 2012.  (Doc. 185-5, p. 4).  East and North cell houses went to Level 4 on October 11, 2012 and normal operations on October 16, 2012.  (Doc. 185-5, p. 4).  The West cell house went on Level 1 lockdown on October 19, 2012 after an inmate altercation in the West dining room, (Doc. 185-10, p. 98), and resumed normal operations on October 23, 2012.  (Doc. 185-5, p. 4). Intel interviewed inmates from the West cell house on October 20, 2012.  (Doc. 185-10, p. 98).  East cell house went on Level 4 lockdown on October 22, 2102.  (Doc. 185-5, p. 4).  The entire prison went on Level 1 lockdown on October 26, 2012 due to a staff assault on Front Street.  (Doc. 185-5, p. 4) (Doc. 185-10, p. 33).  On October 29, 2012, the South Uppers 5 and 7 galleries were shaken down with no contraband found.  (Doc. 185-10, p. 33).  The South upper 6 and 8 galleries were shaken down on October 30, 2012, also with no major contraband found.  (Doc. 185-10, p. 33).  South Lowers 1 and 3 galleries were shaken down on November 1, and 2 and 4 galleries were shaken down on November 2, 2012.  (Doc. 185-10, p, 33).  Again, no contraband was found.  (Doc. 185-10, p.

33).  North 1 went to Level 4 on November 5, 2012 and normal operations on November 13, 2012.  (Doc. 185-5, p. 4).  Intelligence conducted interviews with 35 inmates on November 8, 2012, and randomly shook down 19 cells, with no contraband found.  (Doc. 185-10, p. 33).  North 2, South Lowers, and the East and West cell house went to Level 4 on November 13, 2012 and resumed normal operations on November 20, 2012.  (Doc. 185-5, p. 4).  South Lowers went on Level 4 on November 20, 2012 and resumed normal operations one week later.  (Doc. 185-5, p. 4).

The prison went back on a Level 1 lockdown on December 9, 2012 due to a disturbance involving 12 inmates in the West dining room.  (Doc. 185-10, p. 23).  On December 10, 2012, intel conducted a call out consisting of 72 interviews, and 75 West cell house cells were shaken down with no major contraband found.  (Doc. 185-10, p. 23).  All cell houses except West went to Level 4 on December 11, 2012 and resumed normal operations on December 12, 2012.  (Doc. 185-5, p. 4).  Menard intelligence interviewed 7 more inmates on December 11, 2012 and 62 inmates on December 12, 2012.  (Doc. 185-10, p. 23).  John Howard also visited the institution on December 12.  (Doc. 185-10, p. 23).  West cell house was placed on Level 4 lockdown at 3:00 pm on December 13.  (Doc. 185-10, p. 10).  On December 14 the entire prison went back on Level 1 lockdown after a staff assault outside the North 2 dining room.  (Doc. 185-5, p. 4) (Doc. 185-10, p. 1).  On December 15, 2012, the North 2 odd side shakedown was completed with only nuisance contraband found.  (Doc. 185-10, p. 1).  With the exception of North 2, all cell houses went to Level 4 on December 20, 2012 and to normal operations on December 24, 2012; North 2 went to Level 4 on December 24, 2012, and to normal operations on December 27, 2012.  (Doc. 185-5, p. 4).  The entire prison went back on Level 4 lockdown from December 26, 2012 to December 27, 2012 due to inclement weather and call-ins.  (Doc. 185-5, p. 4) (Doc. 185-10, p. 1).  The prison went back on Level 4 lockdown from December 29, 2012 until December 30, 2012.  (Doc. 185-5, p. 4).  The prison was also on Level 1 lockdown from December 31, 2012 until January 1, 2012.  (Doc. 185-5, p. 4).

The prison went on Level 1 lockdown on January 19, 2013 due to a staff assault.  (Doc. 185-5, p. 5) (Doc. 185-17, p. 44).  Intel began conducting call outs on January 20.  (Doc. 185-17, p. 44).  All cell houses except East cell house went on Level 4 lockdown on January 22, 2013 and returned to normal operations on January 23, 2013.  (Doc. 185-5, p. 5).  East cell house went on Level 4 on January 23, 2013 and normal operations on January 24.  (Doc. 185-5, p. 5).  On January 31, 2013, the whole prison went on Level 1 lockdown until February 4, 2013 due to a possible inmate on inmate homicide.  (Doc. 185-5, p. 5) (Doc. 185-17, p. 36).

The facility went back on Level 1 lockdown on February 5.  (Doc. 185-5, p. 5).  A group of approximately nine inmates attacked two guards during chapel service, causing serious injury to one of them.  (Doc. 185-13, p. 83-84).  Intel searched 57 cells and interviewed 68 inmates the next day, finding only minor contraband.  (Doc. 185-13, p. 83).  Intel conducted more interviews on February 7, 12, 13.  (Doc. 184-13, p. 83).  Strip searches of inmate workers and cell shakedowns were also conducted during this time, but only minor contraband was recovered.  (Doc. 184-13 p. 83).  On February 13, Harrington, Jones, Butler, Brown, Lyerla, and Hassenmeyer toured the yards, with an eye towards dividing them to ensure better inmate management.  (Doc. 184-13 p. 82).  A homemade weapon was discovered in the East cell house on February 15.  (Doc. 185-13, p. 82).  Upper Level staff continued to tour various areas of the institution during this time while intel continued investigating.  (Doc. 185-13, p. 82).  The Weapons Task Force was also active in searching and removing miscellaneous metal from the institution.  (Doc. 185-13 p. 81-82).  North 1 went to Level 4 on February 26, 2013.  (Doc. 185-5, p. 5).  On February 27, a lieutenant meeting was held in which the dining room practices when coming off lockdown were discussed.  (Doc. 185-13, p. 80).

North 1 was on Level 4 lockdown on March 1, 2013; all other units continued on Level 1.  (Doc. 185-5, p. 5).  A homemade weapon was discovered in West house during shower lines on March 4.  (Doc. 185-13, p. 80).  In addition to North 1, all other units went to Level 4 on March 5,

2013, except West cell house, where the weapon was discovered. (Doc. 185-5, p. 5) (Doc 185-13, p. 80). Cell searches, inmate interviews, and Weapons Task Force activities continued. (Doc. 185-13, p. 80). Additional weapons were discovered on the East and West yards on March 8. (Doc. 185-13, p. 80). New security cages were added to the dining rooms. (Doc. 185-13, p. 79). East cell house went to Level 1 on March 14, 2013 per Harrington. (Doc. 185-5, p. 5) (Doc. 185-13, p. 79). A tactical operation was also conducted in the West cell house that day, with all cells searched and 7 weapons recovered. (Doc. 185-13, p. 79). Intel continued its various investigative activities during this time. (Doc. 185-13, p. 79). All other units besides East and West went back to normal operations on March 21, 2013. (Doc. 185-5, p. 5). North 1 and 2, and South Uppers and Lowers went on Level 4 lockdown on March 23, 2013. (Doc. 185-13, p. 78). The rest of the institution went on Level 4 lockdown on March 25. (Doc 185-13, p. 78). South cell house was searched on March 26 by the tactical team and 3 homemade weapons were recovered. (Doc. 185-13, p. 78). North 2 went to Level 1 lockdown on March 27. (Doc. 185-13, p. 78). Intel activities continued. (Doc. 185-13, p. 78). Auditors arrived to tour the facility on April 1. (Doc. 185-13., p. 78). North 1 cell house and R&C resumed normal operations on April 3, while the rest of the institution remained on Level 4. (Doc. 185-13, p. 78) South Uppers and Lowers resumed normal operations on April 10, 2013. (Doc. 185-13, p. 77). North 2 resumed normal operations on April 16. (Doc. 185-13, p. 77). East cell house resumed normal operations on April 18, leaving only West on Level 4. (Doc. 185-13, p. 77). North 2 was also placed on Level 4 on April 23 due to a fight on the yard. (Doc 185-13, p. 76). West cell house eventually went on a modified schedule that permitted some galleries to eat out. (Doc. 185-13, p. 76, 113).

On May 3, 2013, East cell house went on a Level 1 lockdown due to an incident. (Doc. 185-5, p. 5) (Doc. 185-13, p. 68). A tactical search was conducted, and several items confiscated, which provided the justification for continuing the lockdown in the East cell house and putting the rest of

the prison on Level 4.  (Doc. 185-13, p. 68).  All cell houses except East returned to normal operations on May 5, but East remained on Level 1 and intel continued to conduct cell searches, inmate interviews and drug tests.  (Doc. 185-13, p. 68).   The lockdown was downgraded to Level 4 on May 7, 2013 and normal operations resumed in the East cell house on May 8, 2013.  (Doc. 185-5, p. 5).   All cell houses went on Level 4 lockdown for one day on May 20, 2013 because of a tactical operation authorized by Deputy Director Ty J. Bates.  (Doc. 185-5, p. 5) (Doc. 185-13, p. 67).  The prison went on Level 1 lockdown on May 27, 2013 due to a 3 on 1 inmate on inmate assault that resulted in one inmate being hospitalized.  (Doc. 185-13, p. 41).  Intel conducted interviews and cell shakedowns into June in response to this incident.  (Doc. 185-13, p. 40-41).  On May 29, 2013, East cell house, South and North cell house, and R&C went on Level 4 lockdown; West cell house went on Level 4 on May 30.  (Doc. 185-5, p. 5).  East cell house, South cell house, North cell house, and R&C resumed normal operations on May 30, 2013.  (Doc. 185-5, p. 5).

On June 3, 2013, all cell houses went on Level 4 due to flooding; normal operations resumed June 11, 2013.  (Doc. 185-5, p. 5).  Cell shakedowns were also conducted during this time as part of a continuing response to the May incident.  (Doc. 185-13, p. 40).  West cell house went on Level 1 lockdown on June 24, 2013 due to an inmate on inmate assault.  (Doc. 185-13, p. 34).  It went to Level 4 lockdown on June 25, 2013 and resumed normal operations on June 26, 2013.  (Doc. 185-5, p. 5).  During that time, 119 cadets and 23 tactical staff searched the West cell house and found 1 homemade weapon, 1 razor blade, and miscellaneous security threat group material.  (Doc. 185-13, p. 33).  Intel also conducted interviews with 10 inmates.  (Doc. 185-13, p. 37).  On June 25, 2013, East cell house, South cell house, North cell house, and R&C went on Level 4 lockdown until the following day because the training academy was conducting shakedowns.  (Doc. 185-5, p. 5) (Doc. 185-13, p. 35).

On August 14, 2013, all divisions went on Level 1 lockdown due to as staff assault until August 16, 2013, when they transitioned to Level 4 lockdown.  (Doc. 185-5, p. 6) (Doc. 185-13, p. 23).  Intel conducted inmate interviews and cell searches between August 15 and August 19.  (Doc. 185-13, p. 23).  Normal operations resumed on August 20, 2013.  (Doc. 185-5, p. 6).  North 2 was placed on Level 1, lockdown on August 27, 2013 due to inmates fighting on segregation yard and noon feeds.  (Doc. 185-13, p. 20). Normal operations resumed on August 29, 2013.  (Doc. 185-5, p. 6).  West cell house went on a Level 1 lockdown on August 28, 2013 at 7 pm for a shakedown.  (Doc. 185-5, p. 6).  Intel conducted 7 inmate interviews and searched 18 cells on the 28th.  (Doc. 185-13, p. 20).  West cell house then went to Level 4 on August 29, 2013 for inmate related reasons.  (Doc. 185-5, p. 6).  Normal operations resumed on August 30, 2013.  (Doc. 185-6, p. 6).

On September 5, 2013, West cell house went on Level 1 lockdown until September 6 due to an inmate altercation in the East dining room.  (Doc. 185-5, p. 6) (Doc. 185-13, p. 18).  South cell house went on Level 1 lockdown on September 10, 2013 in order to conduct a cadet shakedown.  (Doc. 185-5, p. 6) (Doc. 185-13, p. 17).  All other cell houses went on Level 4 lockdown the same day for administrative reasons per Deputy Director Stock.  (Doc. 185-5, p. 6) (Doc. 185-13, p. 15).  All units resumed normal operations on September 11, 2013.  (Doc. 185-5, p. 6).

West cell house went on Level 4 lockdown for one day on October 9, 2013 pursuant to Deputy Director Gaetz's orders.  (Doc. 185-5, p. 6) (Doc. 185-13, p. 14).  East cell house was on Level 1 lockdown from October 18, 2013 due to a fight involving three inmates in the East dining room.  (Doc. 185-13, p. 7).  The lockdown lasted until October 21, 2013, when normal operations resumed because the investigation had revealed that the fight was a result of one inmate making a racially-charged comment to another.  (Doc. 185-5, p. 6) (Doc. 185-13, p. 9).

All units went on Level 4 lockdown from November 7 through the 8th in order to conduct shakedowns.  (Doc. 185-5, p. 6) (Doc. 185-13, p. 6).

On December 6, 2013, all units went on a Level 4 lockdown until December 7 due to inclement weather.  (Doc. 185-5, p. 6).  West cell house went on Level 1 lockdown on December 23, 2013 due to three inmates fighting on 8 gallery after returning from chow.  (Doc. 185-13, p. 1). West cell house went to Level 4 lockdown on December 24, 2013; and resumed normal operations on December 25, 2013.  (Doc. 185-5, p. 6). All units went on Level 4 lockdown on New Year's Eve for administrative purposes.  (Doc. 185-5, p. 6).  Normal operations resumed January 1, 2014.  (Doc. 185-5, p. 6).

## Legal Standards

### 1.  Summary Judgment Standard

Summary judgment is proper only if the admissible evidence considered as a whole shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  ***Dynegy Mktg. & Trade v. Multiut Corp.,*** **648 F.3d 506, 517 (7th Cir. 2011) (citing Fed. R. Civ. P. 56(a)).**   The party seeking summary judgment bears the initial burden of demonstrating—based on the pleadings, affidavits and/or information obtained via discovery—the lack of any genuine issue of material fact.  ***Celotex Corp. v. Catrett,*** **477 U.S. 317, 323 (1986).**  In determining whether a genuine issue of material fact exists, the Court must view the record in a light most favorable to the nonmoving party.  ***Anderson v. Liberty Lobby, Inc.,*** **477 U.S. 242, 255 (1986).**

If a party fails to properly address another party's assertion of fact, courts may "grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it." **FED. R. CIV. P. 56(e).**  A mere scintilla of evidence supporting the non-movant's position is insufficient; a party will successfully oppose summary judgment only when it presents definite, competent evidence to rebut the motion. ***Anderson,*** **477 U.S. at 252.** ***See also Steen v. Myers,*** **486 F.3d 1017, 1022 (7th Cir. 2007)**

**("[S]ummary judgment is . . . the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.") (internal citations omitted).**   There is "no genuine issue of material fact when no reasonable jury could find in favor of the nonmoving party." **Van Antwerp v. City of Peoria, 627 F.3d 295, 297 (7th Cir. 2010); accord Anderson, 477 U.S. at 248 (finding material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party).**

At summary judgment, the Court's role is not to evaluate the weight of the evidence, to judge witness credibility, or to determine the truth of the matter, but rather to determine whether a genuine issue of triable fact exists. **Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co., 528 F.3d 508, 512 (7th Cir. 2008)**.

### 2. Conditions of Confinement

In a conditions of confinement case, the plaintiff must prove both the objective factor—that he suffered a sufficiently serious deprivation—and the subjective factor—that the defendant subjectively acted with deliberate indifference to the plaintiff's condition of confinement—to prove that an Eighth Amendment constitutional violation occurred.  **Sain v. Wood, 512 F.3d 886, 894 (7th Cir. 2008); Helling v. McKinney, 509 U.S. 25, 35 (1993).**  With respect to the objective factor, the plaintiff is required to show scientific and statistical proof of the potential harm and the likelihood that such injury to health will actually be caused by the condition of confinement.  **Id.** at **36.**   Further, a court is required to assess whether society considers the risk that the prisoner complains of to be "so grave that it violates contemporary standards of decency to expose *anyone* unwilling to such a risk." **Id.**  With respect to the subjective factor, the defendant must have known of the substantial risk of serious harm but disregarded that risk by failing to take reasonable measures to address it. **Townsend v. Fuchs, 522 F.3d 765, 773 (7th Cir. 2008), citing Farmer v.**

*Brennan*, 511 U.S. 825, 847 (1994).  It is not enough for the inmate to show that the official acted negligently or that he or she should have known about the risk.  *Id.*  Instead, the inmate must show that the official received information from which the inference could be drawn that a substantial risk existed, and that the official actually drew the inference.  *Id.*

In determining whether a deprivation is "serious," a court must consult the "evolving standards of decency that mark the progress of a maturing society." *Rhodes v. Chapman*, 452 U.S. 337, 346.  Prisons need not be comfortable, but they must provide "the minimal civilized measure of life's necessities." *Id.* at 347.  Previously, the Seventh Circuit has found that denial of exercise in a segregation or solitary confinement scenario could be cruel and unusual. *Pearson v. Ramos*, 237 F.3d 881, 884 (7th Cir. 2001).  They also specifically held that the lockdown of a segregated inmate for a six month period, during which the inmate's time outside of his cell was severely limited, constituted an objectively serious condition. *Delaney v. DeTella*, 256 F.3d 679, 684 (7th Cir. 2001).  The *Delaney* Court also recognized that legitimate penological reasons could justify the restriction.  *Id.*  The proper guidepost is the "norm of proportionality," which requires the Court to weigh the duration of the lockdown against the nature of the infraction that caused it. *Pearson*, 237 F.3d at 885; *Turley v. Rednour*, 729 F.3d 645, 652 (7th Cir. 2013);

### Analysis

Plaintiff alleges that the lockdowns are unconstitutional because they occurred for flimsy reasons or no reasons at all. *See Turley v. Rednour*, 729 F.3d 645, 652 (7th Cir. 2013).  However, Plaintiff's evidence is not sufficient to show that the lockdowns violated the norm of proportionality; even taking the lockdowns in combination with Plaintiff's other claims.  First of all, as to Plaintiff's claim that he was improperly double-celled, the Court notes that the double celling is alleged to have begun in June 2013, near the end of the period at issue in this litigation.  Although Plaintiff has argued that the double celling is inappropriate because a mental health professional

determined single-celling was necessary to his mental health, the facts submitted by the Plaintiff do not provide evidence for this position. The mental health professional that authorized the single-celling has died, and the current mental health staff is not aware of the reasons why she recommended single-celling. Plaintiff's own evidence suggests that mental health attempted to place all mental health inmates on certain galleries to make it easier for them to attend group sessions. There was evidence that this location was originally made up of single cells but then modified so double-celling was possible. A reasonable inference is that the reason Plaintiff was originally recommended for single-celling was so he could be moved to the appropriate gallery. There is no evidence that the single-celling was meant to alleviate Plaintiff's mental health symptoms. In light of the lack of evidence on that point, there is no evidence that Defendants were subjectively indifferent to Plaintiff's need for a single-cell.

Plaintiff's largest contention is that lockdowns were not held for penological purposes. Plaintiff testified that it was his subjective experience that lockdowns were used to punish the entire institution for when individual inmates acted out. In various pleadings, Plaintiff has alleged that lockdowns were used for the convenience of the staff, to give staff paid time off and holidays, and that lockdowns were reflexively enforced for two months at a time when staff was involved, regardless of the circumstances. The Court has exhaustively reviewed the lockdown reports and finds no support for Plaintiff's contentions. The Court did not find that the entire prison was placed on lockdown for every incident. On the contrary, the lockdown reports show that the cellhouses were subject to individual determinations and that frequently different cellhouses would be placed on lockdown for shorter period of time or moved to Level 4 lockdown prior to others. It was very difficult to find any patterns in the lockdown progressions, suggesting that the staff was making individual determinations about what cell houses needed during particular security events.

Additionally, although Plaintiff claimed that the lockdowns were a response to staffing levels, it appears that the majority of the lockdowns occurred after incidents of violence. The Court is not in a position to determine that the length and timing of those lockdowns were not penologicaly justified. For example, Plaintiff alleges that the lockdown in response to an incident in the Menard Chapel on February 5, 2013 was excessive because the facility was on lockdown for several months, making the response the longest lockdown in the relevant time period. Plaintiff's position ignores the fact that the February 5th incident was a coordinated attack by nine members of the La Raza gang[1] against two guards that occurred less than three weeks after another assault on staff and possible inmate-on-inmate homicide. This was not an arbitrary exercise of power; it was a response to one of the worst incidents of violence during the relevant time period. Also, the evidence submitted by the prison shows that an extensive investigation was conducted in the wake of the assault that involved interviewing hundreds of inmates and conducting cell shakedowns of all cell houses. Locking inmates down during an investigation makes sense for a number of reasons. For one, it helps preserve the integrity of the investigation by minimizing contact between inmate witnesses during the investigation. It also served to protect the inmate witnesses being interviewed. Additionally, some of these shakedowns revealed hidden weapons, which could have been interpreted as added threats to the safety and security of the institution. The administration also discussed and made changes to the physical structure of Menard during this time in order to improve safety. Other than Plaintiff's own conjecture, there is nothing in the record that this lockdown was a pretense for giving staff paid time off or that it was purposely extended in order to punish the entire institution.

Plaintiff also complained that Menard had a policy of placing the entire institution on Level 1 lockdown for 1 month after a staff assault, followed by 1 month on Level 4, regardless of the

---

[1] The Court is aware of this incident in part because it is the subject of another lawsuit, No. 13-cv-1191-SCW, currently pending, where the parties have submitted significant factual briefing on the events at issue.

other factors.  That is patently untrue.  For example, there was a Level 1 lockdown for a staff assault on April 12, 2011, but the South and North cell houses went to Level 4 a mere two days later and resumed normal operations less than a month after the assault.    Another Level 1 lockdown that occurred in 2012 due to a staff assault lasted two days, and the subsequent Level 4 lockdown lasted a mere two days as well.  A lockdown that occurred on August 14, 2013 due to a staff assault followed the same pattern.    All divisions were on Level 1 lockdown for a two day period and normal operations resumed within the week.  The lockdown that comes closest to matching Plaintiff's pattern is the February 5, 2013 lockdown, which as discussed above, was justified by the severe circumstances surrounding that event.  As Plaintiff has not provided any evidence of his alternate theories on why the lockdowns occurred, the Court cannot conclude that the lockdowns were disproportional to the circumstances to which they were a response.

Plaintiff has also not submitted sufficient evidence that Defendants were subjectively aware of the harm that he was alleging, and that they were deliberately indifferent to the risk of such harm. The lockdown reports repeatedly provide legitimate penological reasons for the lockdowns.  The most frequently used reasons for lockdowns include violence and investigations conducted by intel for the safety and security of the institution.  The individual Defendants were entitled to rely on those reports that there was a legitimate penolocgial reason for the lockdowns.  Plaintiff submitted evidence that he grieved the frequent lockdowns.  But the administrators are still entitled to weigh the reasons for the lockdown against Plaintiff's subjective complaints.  It is also notable that Plaintiff's mental health treaters did not think that variations in his condition were due to the frequent lockdowns and did not recall that Plaintiff complained to them that the lockdowns were making him worse.  While that fact is more relevant to the ultimate issue of damages, an administrator who was trying to balance the lockdowns against Plaintiff's claims of harm to his mental health would be entitled to defer to the mental health care providers on what effect the

lockdowns were having on Plaintiff.  Plaintiff has not submitted sufficient evidence from which a reasonable fact finder could conclude that the Defendants were subjectively indifferent.

## Conclusion

For the foregoing reasons, summary judgment is **GRANTED** in Defendants' favor.  (Doc. 184).  As this disposes of all the claims in this case, the Clerk of Court is **DIRECTED** to enter judgment in Defendants' favor and close the case.

**IT IS SO ORDERED**

**Date:** May 23, 2016                                    /s/ *Stephen C. Williams*
                                                                        **Stephen C. Williams**
                                                                        United States Magistrate Judge